## DECLARATION IN SUPPORT OF VERIFIED COMPLAINT

Under 28 U.S.C. § 1746, I, Brodey B. Gibson, a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, make the following unsworn declaration, under the penalty of perjury, in support of the Verified Complaint to which this declaration is attached:

### I. Introduction

1. This declaration is made in support of a Verified Civil Complaint for forfeiture of property seized pursuant to a valid traffic stop. The Defendant Property is subject to forfeiture under 21 U.S.C. § 881 because the Defendant Property is involved in/facilitated or constitutes the proceeds of drug trafficking and was being transmitted by courier, in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy). This declaration is based upon my personal knowledge and experience obtained as case agent in this case and information I have received from other law enforcement officials.

### II. Declarant's Background and Experience

2. I have been an FBI Special Agent since January 2021 and am assigned to the FBI's Jackson Division Field Office, Pascagoula Resident Agency. I have investigative responsibility for Federal crimes committed in the State of Mississippi within the jurisdiction of the FBI, including violations of the Controlled Substances Act, codified at 21 U.S.C. § 801, *et seq.*

3. During my law enforcement tenure, I have received training and experience in surveillance tactics, interview and interrogation, search and seizure, forfeiture procedures, and criminal interdiction. Additionally, I have participated in numerous narcotics investigations, which have led to the arrest and prosecution of persons involved in narcotics enterprises. I have

**EXHIBIT A**

written and executed numerous search warrants, utilized confidential sources, and initiated seizure of property and U.S. Currency which was linked to illegal activity.

**III.   Items to be Forfeited to the United States of America**

4.   The following asset (the "Defendant Property," the "currency," or "$200,005"):

| Asset ID | Asset Description |
|---|---|
| 24-FBI-007190 | $200,005.00 U.S. Currency, seized from Alfredo Castro |

were seized by the FBI on September 02, 2024, after a traffic stop near the 53 mile-marker on Interstate 10 Westbound, Jackson County, Mississippi.

**IV.   Facts and Circumstances**

5.   On September 2, 2024, at approximately 11:35 p.m., FBI Interdiction Task Force Officers ("TFOs") were performing interdiction duties on Interstate 10 (I-10) in Jackson County, Mississippi. TFOs conducted a traffic stop on a Greyhound bus (Texas tag K062211) on Interstate 10 Westbound near the 53-mile marker for Careless Driving (MS Code § 63-3-1213). The vehicle failed to maintain its lane, allowing the passenger side tires to cross the fog line.

6.   TFOs contacted the driver of the bus and informed him of the reason for the stop. TFOs informed the driver that there would only be a warning for the traffic violation and asked for consent to deploy a service K9 for a free-air sniff around the bus and in the cargo area. The driver consented and opened the cargo area doors beneath the bus. TFOs deployed a K9 who displayed alert behavior to the cargo area. The driver then consented to the TFOs' request to board the bus and speak to passengers.

7.   TFOs informed all passengers on the bus about the K9 alert; passengers were given a chance to claim any small amount of illegal narcotics without the consequence of arrest. TFOs conducted short interviews with each passenger. The line of questioning consisted of origin, destination, purpose for the trip, and if they had a carry-on bag.

**EXHIBIT A**

8. At the middle of the bus on the driver side, TFOs encountered a male, later identified as Alfredo Castro. Castro was "asleep" but gripping the seatbelt tightly. TFOs "woke him up" by touching his hand. TFOs asked where Castro was headed, and Castro said "ID" and began looking through a small black bag at his feet. TFOs repeated the question, and Castro stated he was going to Houston, Texas. TFOs asked where he was coming from. Castro responded "What's the name of it? Atlanta area." Castro referenced visiting locations to buy clothes. TFOs asked him how long he would be in Houston, and Castro told him one day, to see a buyer. TFOs asked to see his small black bag, and Castro handed TFOs the open bag without hesitation. TFOs asked if Castro was traveling with more than $5,000.00 cash. Castro said, "Say what?" TFOs repeated the question, and Castro stated no while handing TFOs his ID while referring to his company.

9. TFOs observed a much larger green backpack at Castro's feet. TFOs asked if the bag was Castro's, and Castro said it was. Castro attempted to move the bag, but he appeared to be struggling as if the bag was heavy. TFOs asked if he could search the slightly opened bag; Castro ignored the request. In Spanish, TFOs asked if they could check the bag. Castro stated, "No weapons." TFOs asked again, in Spanish, if they could search the bag. Castro stated, "I prefer don't."

10. These circumstances established, for the TFOs, a reasonable belief that Castro was involved in money smuggling due to the following facts: (1) Castro's trip between a known source city and distribution city of narcotics smuggling; (2) Castro acting asleep; (3) Castro deflecting TFOs' direct questions and ignoring questions about searching the bag numerous times; (4) how heavy the bag appeared when Castro attempted to move it; and (5) the positive

EXHIBIT A

K9 alert on the bus. This reasonable belief gave officers justification to continue their investigation of Castro and the backpack.

11.     As TFOs took the backpack from Castro's feet to remove it from the bus, they noted how heavy and dense the bag felt. The bag's appearance, weight, and density were consistent with numerous backpacks TFOs had encountered before during interdiction operations which had been full of currency. TFOs set the bag on the ground outside the bus to deploy the K9 around that specific bag and the K9 alerted to an odor on the bag which he had been trained to detect and sat in indication with a pinpoint stare. Given the positive K9 sniff test, TFOs opened the bag and discovered a large amount of U.S. currency in the bag. TFOs had Castro step off the bus.

12.     TFOs told Castro it was fine to have money, but they needed to talk about it. TFOs asked how much cash was in the bag. Castro stated, "Like $120,000." Castro began to open invoices on his phone from his clothing business. Castro continued to avoid answering direct questions by deflecting or attempting to show TFOs something on his phone that was not pertinent to the question at hand. TFOs noticed that Castro's business was located in McAllen, Texas, on an invoice. TFOs asked, "So you're going to McAllen?" Castro stated yes. TFOs asked about Houston, and Castro stated it was just to change buses, which conflicted with the original itinerary Castro gave TFOs. McAllen is a stronghold for Mexican cartel drug and money laundering due to its location in regard to the U.S. and Mexico border.

13.     The large amount of cash that the TFOs found consisted of three bags with rubber-banded U.S. currency in all denominations. This packaging is consistent with the drug trade, but not consistent with normal business practices. When asked about why he was carrying such a large quantity of cash for business instead of using wire transfers, Castro attempted to

EXHIBIT A

show more invoices. He went on to say it was easier. TFOs thought that counting cash, separating denominations, and facing the bills for a bank to accept would be time consuming for amounts of cash as large as Castro possessed. Castro stated he did not like the clothes he inspected in Atlanta, so he was taking the cash back. Castro showed TFOs a bank account on his phone with less than $1,000.00 in it.

14. TFOs asked Castro how long he was in Atlanta, and Castro stated one day. TFOs could see, based on database inquiries, that Castro crossed into the United States from Mexico on September 2, 2024, around midnight. TFOs asked Castro if he had declared the money at the checkpoints, and Castro stated he did. This was in conflict with the records available to a TFO with the Customs and Border Patrol. TFOs asked him where he picked the money up, and Castro deflected the question by stating it represented three months of sales. Castro said he flew to Atlanta with the cash. Castro claimed he told the TSA about the cash, and that the TSA did not take him into a room and question him. TFOs asked why Castro was taking the bus back, and Castro stated that his plans changed. Castro stated he wanted to speak with an agent at the FBI's office about the money.

15. TFOs asked for consent to search Castro's phone while waiting on a transport unit. Castro granted consent. During the search, TFOs found a suspicious thread of messages on Whatsapp. In the thread, Castro and the other subject seemed to be speaking in code such as "candy" and "shoes". TFOs located a photograph of a bundle of rubber-banded money wrapped in a shirt. The previous texts were referencing dropping the "candy" off and 45k. TFOs also located a photograph of a cardboard box similar in size to that of a Lowe's cardboard box commonly used for packing and moving houses. The box was located at the rear of an 18-wheeler trailer full of bundles of clothes consistent with those Castro sold at his business. The

EXHIBIT A

messages surrounding the photo referred to sending "200 pounds of shoes." TFOs knew that the box in the photograph could not hold 200 pounds of shoes unless the shoes were made of metal or cement. TFOs also knew it was common for drug traffickers to exploit legitimate loads of freight to ship drugs and money by comingling them with the freight. When asked, Castro stated that he had $40,000 in a safe in his business office.

16. At that time, TFOs transported Castro and the currency to the FBI Office in Pascagoula, Mississippi, where officers interviewed Castro who advised that he did not speak English well. Accordingly, the interview was partially conducted in Spanish by a Spanish-fluent TFO, who read the FBI Advice of Rights form to Castro in English and Spanish. Castro acknowledged his understanding and signed the aforementioned Advice of Rights form. After being advised of the identities of the interviewing Agents and the nature of the interview, Castro provided the following information:

    a. Castro stated he had been in Atlanta to buy clothes from some vendors in the area, but he only spent one day there and decided not to purchase the clothes due to their poor quality. Castro explained he flew to Atlanta from Texas but decided to take the bus back because the return flights were expensive.

    b. Castro said he spent the day before his trip to Atlanta in Mexico visiting family. Castro advised that he had $199,960.00 in his bag, which he had intended to use to purchase clothing, but changed his mind.

    c. Castro said he works for Marshal Clothing LLC[1], located at 66 28th St McAllen, Texas, which buys donated clothes from vendors and then resells. Castro told the TFOs he had $8,000 or $12,000 in the safe at his business, contradicting his previous claim of having $40,000.

    d. When Castro allowed the TFOs to look through his iPhone again, TFOs located more photographs on Whatsapp of bundles of money, this time in duct-taped bricks. TFOs showed Castro messages talking about "Candy." TFOs asked Castro if they were speaking in code, and Castro admitted that "candy" was code for money.

---

[1] Government and business record databases indicate that Castro is a "managing member" of the business.

**EXHIBIT A**

17. After concluding the interview, TFOs determined that they needed to investigate further before pursuing any possible federal charges against Castro. The bulk currency was seized as officers determined that probable cause existed to believe that the currency constituted the proceeds of or was facilitating/involved in drug trafficking. No firearms, drugs or other contraband were seized. Castro was released.

18. Castro filed a claim for the seized property on November 23, 2024, attaching more than 900 pages of bank statements, invoices, and income tax records as supporting documentation.

19. A review of the bank statements Castro provided reveal that the financial activity primarily consists of numerous cash deposits from an unknown source, followed by several large wire transfers. This pattern is consistent with money laundering operations. Within the approximately 3 years of bank statements provided there is no indication that large quantities of cash are ever withdrawn; most wire transactions are between $20,000 and $30,000. Statements provided for the months of June, July and August 2024 show no cash withdrawals to indicate the source of the $200,000 that Castro was travelling with.

20. A review of the tax documents provided by Castro reveal that Castro reported a combined income totaling approximately $114,000 for tax years 2020-2022, and a combined net profit from the business of approximately $60,000 for tax years 2020-2022.

21. The business model that Castro describes is questionable and the substantiating documents provided by Castro do not indicate the source of $200,000 in cash.

22. Based upon the above facts and circumstances, there is probable cause to support that the above-described defendant property is proceeds traceable to an exchange for a controlled substance and is, therefore, subject to forfeiture, pursuant to 21 U.S.C. § 881(a)(6).

**EXHIBIT A**

## V.     CONCLUSION

23.     In conclusion, the other investigating agents and I found that probable cause exists that the currency was involved in, facilitated, or constitutes the proceeds of the illicit distribution of controlled substances. This determination was made on the facts and circumstances presented above.

24.     I believe, as required by Rule G(2)(f) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions, that I have a reasonable belief that the government will be able to meet its burden of proof at trial that the Defendant Property was intended to facilitate or used to further a drug crime or is directly related to drug proceeds of Alfredo Castro and/or their associates, in violation of 21 U.S.C. §§ 841 (drug trafficking) and 846 (drug conspiracy) and is therefore subject to forfeiture to the United States of America under 21 U.S.C. § 881.

25.     I declare, pursuant to 28 U.S.C. § 1746, that the foregoing is true and accurate to the best of my knowledge and belief.

Executed this 24th day of February 2025,

*[signature]*

Brodey B. Gibson
Special Agent
Federal Bureau of Investigation

**EXHIBIT A**